1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11  VINCENT HALL,                      No. C 13-1426 TEH (PR)
12            Petitioner,              ORDER DENYING PETITION FOR WRIT
                                       OF HABEAS CORPUS; DENYING
13        v.                           CERTIFICATE OF APPEALABILITY
14  RALPH M. DIAZ, Warden,
15            Respondent.
16  _____/
17
18        Vincent Hall, a state prisoner, has filed this <u>pro se</u>
19  petition seeking a writ of habeas corpus under 28 U.S.C. § 2254.
20  Respondent was ordered to show cause why the petition should not be
21  granted.  Respondent has filed an answer, and Petitioner has filed a
22  traverse.  For the reasons set forth below, the petition is DENIED.
23                             I
24        On February 4, 2009, a San Francisco County jury found
25  Petitioner guilty of second degree murder with personal use of a
26  weapon, two counts of selling oxycodone, and possession of oxycodone
27  for sale.  Clerk's Transcript ("CT") at 810-13, 1339.  Petitioner
28

was found not guilty of first degree murder and two drug-related counts.  CT at 813, 921-23  The trial court found that Petitioner suffered three prior strike convictions, had one prior serious felony conviction, and served four prior prison terms.  CT at 815.  He was sentenced to 78 years to life in state prison.  CT at 817-22.

Petitioner appealed his conviction in the California Court of Appeal.  On September 28, 2011, the California Court of Appeal filed an unpublished opinion affirming the judgment.  People v. Hall, No. A124490, 2011 WL 4499245 (Cal. Ct. App. Sep. 28, 2011).  On January 4, 2012, the California Supreme Court denied Petitioner's petition for review.  Answer, Ex. 7.

II

The following factual background is taken from the order of the California Court of Appeal.[1]

1. June 1, 2007 Sale of Oxycodone and June 13, 2007 Sale of Oxycodone and Possession of Oxycodone for Sale

On June 1, 2007, and June 13, 2007, as part of an ongoing narcotics investigation in the Tenderloin area of San Francisco, Police Inspector John Keane, acting undercover, purchased four oxycodone pills for $160 from Hall on each date.  As to both encounters, Keane denied telling Hall that he was in pain and a veteran who needed drugs because of a war injury.  Keane described Hall's appearance at the time of each sale.  On the first occasion, Hall had hair that was visible about midway to his ears under a beanie cap, and the sale took place in the lobby of a building; on the second occasion, Hall had a shaven head under a baseball cap and the sale took place while Hall was straddling a bicycle.  By the time of trial, Hall's appearance had changed: he was wearing glasses and he may have lost a little weight.  FN2  Keane was sure that Hall was the seller on both occasions even though Keane could not recall if Hall had facial hair on either occasion.

_____

[1] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Keane was able to recognize a person by focusing on the person's eyes, albeit he could see the person's face unavoidably in his field of vision.  Keane recalled Hall's head hair on the first occasion because "it was sticking out."

> FN2. Hall testified that since 2006, his weight had fluctuated as much as fifty or sixty pounds because while he was in prison he was a vegetarian, and when he was on the street he would eat everything and his weight would build up.  He weighed no more than 240 pounds when he was arrested in August 2007.  At the time of the trial, Hall testified he was 40 years old and described himself as six feet five inches tall and weighing "about 241" pounds.

Hall was arrested after the second sale to Keane.  Before the arrest, one of the arresting officers saw Hall and a woman acquaintance of Hall.  As a marked police car approached, Hall appeared to notice its presence and moved his bicycle away from the woman.  Another arresting officer saw Hall get off his bicycle and throw on the ground a large plastic bag that contained, among other drugs, 31 tablets of Percocet (a different name for oxycodone), and 7 capsules of oxycodone.  After his arrest, Hall was found in possession of $160 in marked city funds, $1,772 in United States currency, a cell phone, and a pill bottle with Hall's name on it containing 150 tablets of oxycodone.  An expert on street sales of oxycodone testified that the different types and large amounts of drugs found in Hall's possession on June 13 were possessed for sale.

2. June 2, 2007 Murder of Devin Marzullo

On the evening of June 2, 2007, at about 9:00 p.m., Jacob Lee and his friend Devin Marzullo drove from Castro Valley to the Tenderloin area in San Francisco.  Marzullo wanted to buy methadone pills to end his oxycodone addiction.  During the evening, Lee saw Marzullo in the middle of the sidewalk standing face-to-face with the man that killed him.  The killer was standing next to his bicycle; Lee did not hear any words exchanged between the two men.  Marzullo was unarmed, had his hands at his side, and was not making any aggressive gestures towards the killer.  The killer walked his bicycle to the wall of a nearby building and leaned the bicycle against the wall.  The killer then turned around, made a lunge forward, like a leap, and stabbed Marzullo in his chest as Marzullo was backing up.  Lee did not actually see the knife in the killer's hand. After the stabbing Lee saw Marzullo's body jerk backward and blood squirted from the left side of

Marzullo's chest.  Marzullo ran into the street and then
turned around, rapidly walked away, and ultimately
collapsed on the street.  Marzullo was taken to the
hospital where he was pronounced dead at 10:47 p.m.  An
autopsy revealed that at the time of his death Marzullo
had both oxycodone and methadone in his blood, suggesting
the recent ingestion of those drugs.

Lee spoke with a police officer at the scene.  According
to the police officer, Lee said his friend had "a bad
habit" he had "been trying to kick," and his friend had
been "poked" by a person from whom he was trying to buy
pills.  Lee described the person as a large
African-American male, in his early 30's, about six feet
two inches tall, weighing about 240 pounds, with bushy
hair.  The man was on a bicycle and had left the area on
the bicycle.  At trial, Lee, who described himself as six
feet two inches or six feet three inches tall, testified
that he recalled telling the police that the killer was a
"large" man, "somewhere around 6'3, 240, 250," with a
wide-set face, wearing a beanie cap with hair around the
top of his ears, and a hood over the cap.  The killer had
some facial hair, both a beard and mustache, of maybe two
or three weeks of growth.  There was sufficient light for
Lee to get "a good frontal vision" of the killer as he
"was getting away."  Lee could not see facial markings
because the killer was wearing a hood, but Lee could see
"like a frontal view of—from his eyes, his nose, and he's
got a beard."  Lee could see "a little above the eyebrows,
the nose, the mouth, around the cheek bones."  Lee
recalled seeing the killer in the area about four months
before the stabbing.  Lee had a previous pill addiction
and he used to go regularly to the area to purchase pills.
On three or four previous occasions Lee had seen the
killer riding his bicycle in the neighborhood bound by the
streets Jones, Leavenworth, Turk, and Golden Gate.  The
killer was always on a bicycle and appeared to be "pushing
a product" or "selling pills."

A few days after the murder, Lee worked with a police
sketch artist who generated a sketch based on Lee's
description of the killer.  The sketch was shown to the
jury.  When asked if the sketch looked like the killer,
Lee testified: "This is the best description that I can
give so the sketch artist can pick my brain to draw this.
If I can give you a visual out of my mind, it wouldn't
look like this. Not completely."  However, Lee conceded
the sketch was "not much" different from what he had
described regarding the suspect's hair, the beanie cap on
the suspect's head above the ears, and the facial hair,
"kind of scraggly," with a "slight mustache."  Lee told
the sketch artist that the drawing looked quite a bit like

4

the suspect.

Police Inspector Herman Jones testified that Lee was also shown six photo lineups (each containing six photos) in an effort to establish the identities of the killer and another person that may have been a witness to the murder. The photo lineups were shown to the jury.  In the first lineup he viewed on June 5, 2007, Lee pointed to one person as most resembling the killer, but Lee said the killer was "not that old."  FN3  Lee did not identify any one in the next four photo lineups he viewed on June 19, 2007.  On August 20, 2007, Lee was shown a sixth photo lineup containing six photos from a databank of persons arrested in San Francisco, including Hall's photo.  Police Inspector Edward Wynkoop prepared the photo lineup using a computer-generated photo of Hall taken after his August 7, 2007 arrest, and five other computer-generated photos chosen by Wynkoop.  Wynkoop did not notice the background of Hall's photo was darker than the backgrounds of the other photos.  Wynkoop recognized that the men in the five filler photos were centered in the photos, while Hall's image was "kind of almost closer to the camera, taking up more space."  However, Wynkoop was not able to change the borders of the photos, or move the person's image towards the top or the sides of the photo frame. Wynkoop did the best he could given the limits of the technology.

> FN3.  At trial, Lee did not recall identifying a person in the first lineup as someone who most looked like the suspect who stabbed Marzullo but was "too old."  When asked to look at the person in the lineup in court, Lee denied that the person depicted in the photo looked like the person who stabbed his friend.

Before showing the sixth lineup to Lee, the police inspectors read, and Lee recalled being told, certain admonitions: Lee was about to see a group of photographs, that his judgment should not be influenced by the fact that a police agency was showing the array, that the person who committed the crime might or might not be in the photos, that Lee was in no way obligated to identify anyone, that Lee was to study each photo carefully before making any comments because the photos could be old or new, hair styles changed, persons could alter their identities by growing or shaving facial hair and gaining or losing weight, and skin color could be lighter or darker due to the photographic process.  Lee was not given any information about the men in the lineup. He was not told the height or the weight of the men, or if any man exclusively commuted by bicycle or happened to also sell oxycodone.  Lee was not told to draw no suggestion from

the fact that Hall's head took up almost the entire photographic frame of his image and touched on the margin of the photo.  Within a matter of seconds, Lee picked out the photo of Hall, who was depicted with a shaved head and no facial hair.  Lee did not identify Hall as the killer. Lee only said that "out of all the photos" he had seen, Hall's photo "seems to be most accurate," and that Hall "must have cut [his] hair."  On the written instruction sheet for the lineup, Lee handwrote that the person in position two (Hall) "looks like the suspect" that stabbed his friend Marzullo.

When asked if he recognized anyone in the courtroom, Lee replied that Hall had a "striking similarity" to the killer.  When asked what about Hall looked "very similar," Lee replied: "His frontal view of the frontal of his face, around his eyes, that area appears to be very striking. His eyebrow area and his nose, his cheek bones...."  When asked to describe how Hall's appearance in court was different from the killer, Lee testified Hall did not have facial or head hair.  Hall's height was very similar to that of the killer, but Hall appeared in court to weigh a lot less than the killer.  The jury was shown a video that was taken by a security camera on a nearby building on the evening of June 2, 2007.  While watching the video for the first time in court, Lee was able to identify himself, Marzullo, and the killer.  However, the video quality was insufficient to allow anyone to identify the killer by his face.

3. August 7, 2007 Uncharged Assault and Battery on Charles Fore

On August 7, 2007, at about 7:30 p.m., Hall assaulted and battered Charles Fore on Turk Street near the corner with Leavenworth.  Officer Lawrence McDevitt and Police Officer William Clinton were on routine foot patrol and saw the incident.  FN4  Hall and Fore were having a conversation, and without warning or provocation, Hall punched Fore in his face with a closed fist, causing Fore to fall to the ground.  Hall then used the bottom of his right foot to stomp on Fore's head several times.  Fore tried to protect himself with his arms and by rolling over and facing the ground.  The officers ran towards the men, announced they were police officers, and told Hall to stop and that he was under arrest.  As the officers got closer, Hall looked up and ran away.  The officers pursued Hall as he ran into a laundromat and grabbed a bicycle.  McDevitt caught Hall as he was trying to get his leg over the bicycle. McDevitt struck Hall with a baton on his shoulder to make him stop.  After being taken into custody, Hall was "very stoic ... not showing any emotion."  The officers returned

to Fore who was still on the ground.  Fore's face was very bloody.  Fore sustained a broken jaw, a laceration above his right eye, a "deformity" to his nose, an abrasion to the mouth, and a missing tooth.  The officers found a green pill, suspected to be oxycodone, "right next to Mr. Fore's body," "not quite underneath him.  Maybe an inch or two in the mid-body area, near the hip and the hand."

> FN4. Although Officer McDevitt had seen Hall the day before, the officer did not immediately recognize Hall because there were other men of his stature, size, height, and weight, in the area.

The arresting officers took Hall's sneakers and a folding-blade knife with a wood-type handle that was found in his front pant pocket.  An expert in "blood pattern evidence" testified it was not surprising that Hall's sneakers had no traces of blood on them because some time during the attack Fore attempted to cover his face and it could not be determined when Fore started to bleed during the attack.  Another expert testified that Hall's knife could not be ruled out as the murder weapon in the June 2 killing because it was consistent in size, dimension, and features of the type of weapon used to stab Marzullo.

Fore could not remember anything about the two weeks prior to the assault or the assault itself.  However, he testified he used oxycodone from the fall of 2006 until the time of the assault in August 2007.  Fore recognized Hall as a person from whom he purchased OxyContin (concentrated version of oxycodone) on 10 to 20 occasions in the Tenderloin Area.  At the time of those drug sales, Hall always had a backpack and rode a bicycle.  Sometimes Hall had facial hair, and on some occasions he wore his head hair in braids or a short Afro underneath a beanie or baseball cap.  Fore was shown the police sketch of the suspect in the Marzullo murder.  Fore indicated the sketch looked like the man who sold him oxycodone, whom he identified as Hall.

B. Defense

Hall asserted an entrapment defense to the drug sales he admittedly made to Keane on June 1, 2007, and June 13, 2007.  Starting in the summer of 2006 until his arrest on August 7, 2007, Hall took oxycodone for pain in his lower back and feet caused by a spinal injury.  Hall acquired oxycodone pills through valid and fraudulent prescriptions, and by buying pills on the street.  Hall had "loaned" oxycodone pills to other people and later gotten pills back, but he never sold any pills except to Keane.  As to the first sale, Hall felt sorry for Keane,

7

who had promised to both pay Hall for the pills and return
four pills to him once Keane filled his own prescription
for oxycodone.  As to the second sale, Hall claimed Keane
had played on Hall's sympathy by begging for pills for
pain, giving a reasonable excuse for his failure to return
four pills, and agreeing to return eight pills and any
extras he could get below the average price.  FN5  Hall
contended the pills found on the street at the time of his
June 13, 2007 arrest belonged to an acquaintance who was
with him at that time.

> FN5. On rebuttal, Keane testified he never told Hall
> that he would give him pills for those he had
> purchased from Hall. As an undercover officer Keane
> purchased drugs but he did not have access to drugs
> to give to sellers.

Hall denied killing Marzullo.  At the time of the murder,
Hall lived in the East Bay and came to San Francisco to
buy bicycles for his bicycle business.  Although Hall "was
somewhere in the proximity of San Francisco" on the day of
the killing based on his cell phone records, he did not
independently recall where he was at or near the time of
Marzullo's killing, noting he was not charged with the
murder until November 15, 2007.  FN6  A defense expert
witness testified that Hall's knife, with a thumb stud on
the side of the blade, was very common; such a knife was
available from many vendors.  To counter the prosecution's
argument that Hall had shaved his head and facial hair to
avoid apprehension after the murder, Hall testified and
presented evidence and witnesses to demonstrate that for
various reasons he had routinely changed his head and
facial hair styles before the murder.

> FN6. An evaluation of calls to and from Hall's cell
> phone indicated that on June 2, 2007, there were
> several incoming and outgoing calls that used San
> Francisco cell towers, consistent with Hall being in
> or around the Tenderloin area at the time of murder.
> On the evening of June 2, 2007, at 10:21 p.m., a
> phone call was placed on Hall's cell phone using a
> tower in San Francisco, and there were no calls until
> 11:05 p.m. when a phone call was placed using a tower
> in Oakland.

Hall testified he never assaulted Fore and never sold
drugs to Fore.  Hall claimed that on August 7, 2007, he
witnessed several assaults on Fore in the Tenderloin area.
At about noon, Fore was struck in the face by an
unidentified patron of a restaurant, and at 7:00 p.m.
Fore was attacked on two occasions: once by an
unidentified Hispanic man, and then, 15 minutes later, by

8

> an unidentified African-American man.  The last incident was apparently seen by police officers.  Hall called witnesses to challenge the credibility of Fore and the police officers who had seen the incident.  Hall's treating podiatrist, also qualified as an expert, testified that Hall's physical condition would have made it extremely difficult for him to attack Fore by stomping his foot as described by the police officers.

<u>Hall</u>, 2011 WL 4499245, at *1-5.

### III

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Penry v. Johnson</u>, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

9

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011).

10

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts. See Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the state's highest court, the court "looks through" to the last reasoned opinion. See Ylst, 501 U.S. at 804.

With these principles in mind regarding the standard and scope of review on federal habeas, the Court addresses Petitioner's claims.

IV

A

Petitioner first contends that the trial court erred when it permitted the prosecution to introduce evidence of the separately charged assault of Charles Fore. The state appellate court denied this claim as follows:

> Over defense objection, the trial court granted the prosecution's motion to admit evidence of the August 7, 2007 assault and battery on Fore on the issue of a common plan or scheme. In so ruling, the trial court relied on

11

pertinent portions of our Supreme Court's decision in
<u>People v. Ewoldt</u> (1994) 7 Cal. 4th 380, 399-404.  In
evaluating the prejudicial effect of the other crimes
evidence, the trial court found there was a strong
tendency that the evidence demonstrated a common design
or plan; the evidence of the Fore incident was
independent of the evidence of the charged murder
offense; the results of the prior trial on the Fore
incident would be presented to the jury to limit the
prejudicial impact of the other crimes evidence, pursuant
to <u>People v. Griffin</u> (1967) 66 Cal.2d 459, 465; the
evidence of the Fore incident was no more inflammatory
than the evidence of the charged murder offense; and both
incidents were "close in time and close in location."

Before the first witness testified on the issue, the
court advised the jury it was going to hear testimony
concerning an alleged assault and battery on Fore that
occurred on August 7, 2007.  The evidence was being
offered to assist the jury in determining whether
Marzullo's killing was part of a scheme, design, or plan,
for the illegal sale of prescription pills by Hall.  The
court admonished the jurors that "if, from all of the
evidence in this case, you believe that the existence of
such a scheme, plan, or design has not been proven ... to
your satisfaction, you are not to consider ... the
evidence concerning the Charles Fore incident for any
purpose."  The court further explained that the jurors
were to consider as evidence the following stipulated
facts: The circumstances of the Fore incident had been
heard in another jury trial in May to June of 2008.  Hall
had been charged with attempted murder, assault with
great bodily injury, and battery with serious bodily
injury.  The jurors in that case found Hall was not
guilty of attempted murder, but they were unable to reach
a unanimous verdict on the assault and battery charges.
The People had refiled assault and battery charges
against Hall, those charges were "still active" and
pending "elsewhere in this building," and were not before
the jury in this case.

In its closing instructions, the court again advised the
jury as to how to evaluate the evidence of the Fore
incident.  Using language in CALCRIM No. 375, the court
told the jury, in pertinent part: "If you decide that the
defendant committed the uncharged act against Charles
Fore, ... you may, but are not required to, consider that
evidence for the limited purpose of deciding whether or
not: [¶]  The defendant had a common plan or scheme to
engage in violence as part of a scheme to illegally sell
prescription pills including Oxycodone.  [¶]  In
evaluating this evidence, consider the similarity or lack

12

of similarity between the uncharged act and the charged act.  [¶]  Do not consider this evidence for any other purpose except for the limited purpose of determining a common plan in this case.  [¶]  Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime.  [¶]  If you conclude that the defendant committed the uncharged act on August 7, 2007 regarding Charles Fore, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of murder.  The People must still prove the charged offense ... beyond a reasonable doubt."

On appeal Hall challenges the trial court's ruling allowing evidence concerning the Fore incident.  He also argues the evidence so infected the fairness of the entire trial and so shored up the prosecution's weak case for murder that this court should find its admission violated his federal constitutional right to a fair trial.  He contends reversal is required because the admission of the evidence was not harmless beyond a reasonable doubt  (Chapman v. California (1967) 386 U.S. 18, 24 [87 S.Ct. 824; 17 L.Ed.2d 705] (Chapman)) and resulted in a miscarriage of justice (People v. Watson (1956) 46 Cal.2d 818, 836 (Watson)).  We need not address Hall's contentions as to the trial court's ruling allowing evidence of the Fore incident.  Even if the evidence should not have been admitted, Hall has failed to demonstrate prejudicial error requiring reversal under either the Chapman or Watson standard of review.

Hall argues evidence of the Fore incident was prejudicial because it unduly affected the fairness of the trial, "making [the trial] about who he was, rather than what he did or did not do in relation to the charged homicide, and because the jur[ors] would have been encouraged to punish him for the Fore attack as to which they could perceive that he would otherwise escape punishment...." However, the prejudice of which Hall complains "is inherent whenever other crimes evidence is admitted [citation], and the risk of such prejudice was not unusually grave here."  (People v. Kipp (1998) 18 Cal.4th 349, 372.)  The Fore incident was not "significantly more inflammatory" than the Marzullo murder.  (People v. Carter (2005) 36 Cal.4th 1114, 1150.)  The jury was specifically informed that a previous jury acquitted Hall of attempting to murder Fore and failed to reach a verdict on the assault and battery charges.  "[P]roof of an acquittal" tends "to weaken and rebut the prosecution's evidence of the other crime."  (People v. Griffin, supra, 66 Cal.2d at p. 465.)  The jurors' knowledge that Hall would be facing another trial

13

regarding the Fore incident made it less likely they
would perceive that Hall would escape punishment for his
alleged attack against Fore unless the jury convicted him
of Marzullo's murder.

We are not persuaded by Hall's arguments regarding the
relative strength of the Fore incident as compared to the
charged murder offense.  Regardless of the purported
weaknesses in the murder case, Hall does not argue the
evidence was insufficient to support his conviction for
murder.  The rejection of first degree murder in favor of
second degree murder shows the jurors were focused on
Hall's criminal liability, if any, for the charged murder
offense, and not on punishing Hall for the Fore incident.
Nor are we persuaded by Hall's contention that this was a
close case because of the length of deliberations.
Unlike the situations in People v. Cadenas (1982) 31
Cal.3d 897, 907, and Bowen v. Ryan (2008) 163 Cal. App.
4th 916, 927, cited by Hall, the jurors in this case were
asked to consider the testimony of more than 40 witnesses
and more than 150 exhibits presented in 24 days over two
months.  Thus, it is not surprising that deliberations
took four days and that the jury requested read backs of
testimony on four occasions.  We therefore deem it
inappropriate to speculate that the jury found this was a
"close" case based on the length of deliberations.

Similarly unavailing is Hall's reliance on certain
statements in the prosecutor's closing argument, to which
no objections were made by defense counsel.  The trial
court advised the jurors how to evaluate the evidence of
the Fore incident and told them to disregard any comments
by counsel that conflicted with the court's instructions.
By the court's instruction that the Fore incident was
insufficient to prove Hall guilty of murder beyond a
reasonable doubt, the "jurors necessarily [understood]
that they must consider all of the other evidence before
convicting [Hall]" of murder.  (People v. Reliford (2003)
29 Cal.4th 1007, 1015 (Reliford).)  The jury was also
instructed as to the elements of murder in the first
degree and second degree, that a conviction required
proof beyond a reasonable doubt (CALCRIM Nos. 500, 520,
521), and that for each offense a guilty verdict required
a union or joint operation of act or conduct and
requisite intent (CALCRIM No. 252).  "No reasonable juror
would believe those requirements could be satisfied
solely by proof of" Hall's commission of an assault and
battery against Fore.  (Reliford, supra, 29 Cal.4th at
pp. 1013-1014.)  The evidence of the Fore incident,
"while adverse to [Hall], was not of such overwhelming
force that it would have caused a reasonable juror to
abandon the trial court's instructions and presume

14

defendant's guilt" of the charged murder offense.
(<u>People v. Quartermain</u> (1997) 16 Cal.4th 600, 627.)

Accordingly, we conclude any purported error in admitting
evidence of the Fore incident did not result in a
miscarriage of justice as it is not reasonably probable a
result more favorable to Hall would have been reached
absent the purported error.  (<u>Watson</u>, <u>supra</u>, 48 Cal.2d at
p. 836.)  Nor is there any substantial likelihood that
evidence of the Fore incident was used by the jury for an
illegitimate purpose or otherwise rendered the trial
unfair.  Consequently, any error was harmless beyond a
reasonable doubt.  (<u>Chapman</u>, <u>supra</u>, 386 U.S. at p. 24.)

<u>Hall</u>, 2011 WL 4499245, at *6-8 (footnotes omitted).

A state court's procedural or evidentiary ruling is not
subject to federal habeas review unless the ruling violates federal
law, either by infringing upon a specific federal constitutional or
statutory provision or by depriving the defendant of the
fundamentally fair trial guaranteed by due process.  See <u>Pulley v.
Harris</u>, 465 U.S. 37, 41 (1984); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918,
919-20 (9th Cir. 1991).  Accordingly, a federal court cannot disturb
on due process grounds a state court's decision to admit evidence of
prior crimes or bad acts unless the admission of the evidence was
arbitrary or so prejudicial that it rendered the trial fundamentally
unfair.  See <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995);
<u>Colley v. Sumner</u>, 784 F.2d 984, 990 (9th Cir. 1986).

The Ninth Circuit has held that the admission of other
crimes evidence violates due process where there are no permissible
inferences the jury can draw from the evidence (in other words, no
inference other than conduct in conformity therewith).  See <u>McKinney
v. Rees</u>, 993 F.2d 1378, 1384 (9th Cir. 1993); <u>Jammal</u>, 926 F.2d at
920.  But it is generally upheld where: (1) there is sufficient

15

proof that the defendant committed the prior act; (2) the prior act is not too remote in time; (3) the prior act is similar (if admitted to show intent); (4) the prior act is used to prove a material element; and (5) the probative value of admitting evidence of the prior act is not substantially outweighed by any prejudice the defendant may suffer as a result of its admission.  See McDowell v. Calderon, 107 F.3d 1351, 1366 (9th Cir.) (sentencer may rely on prior criminal conduct not resulting in a conviction if the evidence has "'some minimal indicium of reliability beyond mere allegation'"), amended, 116 F.3d 364 (9th Cir. 1997), vacated in part by 130 F.3d 833, 835 (9th Cir.) (en banc); Walters, 45 F.3d at 1357-58 (upholding state admission of prior act on federal habeas review);

To the extent that Petitioner is arguing that the state courts erroneously applied or interpreted state law with respect to the admission of the evidence, no federal habeas relief is available.  The Supreme Court has repeatedly held that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law. See Swarthout v. Cooke, 562 U.S. 216, 222 (2011).  Nor is there any established Supreme Court authority that the admission of irrelevant or overtly prejudicial evidence can justify habeas relief.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

Petitioner has also failed to demonstrate that the admission of this evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  As discussed by the

California Court of Appeal, the jury was properly and repeatedly
instructed in the correct manner to consider the evidence, and there
were permissible inferences that the jury could have drawn from the
evidence.  There was sufficient proof that Petitioner committed the
other crime, which was quite recent, and it was relevant to
demonstrate the similarities in both attacks and that there was a
common plan or scheme to attack unsuspecting buyers of the drugs.
Accordingly, the state appellate court's denial of the claim was not
contrary to, or an unreasonable application of, clearly established
Federal law.  Petitioner is not entitled to habeas relief on this
claim.

**B**

Petitioner contends that the trial court violated his
right to a fair trial by denying his motion to sever the drug
charges.  The state appellate court denied his claim as follows:

> On appeal Hall argues the murder and drug counts were not
> properly joined pursuant to section 954, and even if the
> case qualified for joinder, the court abused its
> discretion in denying his motion to sever and allowing a
> joint trial in this case.  We need not resolve these
> issues.  Even if the counts should not have been
> consolidated, reversal is not required as Hall has failed
> to show that the denial of his motion to sever and the
> holding of a joint trial "'actually resulted in "gross
> unfairness" amounting to a denial of due process.'"
> (People v. Mendoza (2000) 24 Cal. 4th 130, 162.)
>
> Because "the consolidated offenses were factually
> separable ... there was a minimal risk of confusing the
> jury or of having the jury consider the commission of one
> of the joined crimes as evidence of defendant's
> commission of another of the joined crimes." (People v.
> Mendoza, supra, 24 Cal. 4th at p. 163.)  It does "not
> appear reasonably likely ... that the jury would be
> influenced in determining [Hall's] guilt of "murder by
> its knowledge of the charged drug offenses. (People v.
> Bean (1988) 46 Cal. 3d 919, 939.)  Any doubts the jury

17

might otherwise have had about the identity of Marzullo's killer would not have been resolved by the evidence concerning the charged drug offenses.  (People v. Balderas (1985) 41 Cal. 3d 144, 174.)  Hall's contention that the joint trial allowed the prosecution to join a weak murder case with stronger drug cases is based on the prosecutor's closing arguments to the jury, to which no objection was made by defense counsel.  We presume the jurors treated the "prosecutor's comments as words spoken by an advocate in an attempt to persuade" (People v. Sanchez (1995) 12 Cal.4th 1, 70, disapproved on another ground in People v. Doolin (2009) 45 Cal. 4th 390, 421, fn. 22), which could be "'totally disregard[ed]'" (People v. Morales (2001) 25 Cal. 4th 34, 47).  Hall's reliance on People v. Earle (2009) 172 Cal. App.4th 372 (Earle) is similarly misplaced.  Unlike the situation in Earle, in this case the jurors' exposure to the charged drug offenses would not have "had the potential to inflame the jury against [Hall] in an unusual and peculiar manner." (Id. at p. 401.)  The strongest indication the jurors were not unduly influenced by the prosecutor's closing arguments or any possible spillover effect of joinder is that after they heard several read backs of testimony, the jurors acquitted Hall of first degree murder and failed to reach a verdict on two drug counts, thereby demonstrating that they viewed and evaluated the evidence on each count separately.  (See People v. Koontz (2002) 27 Cal. 4th 1041, 1075.)

Because Hall has failed to show the consolidated trial on the murder and drug offenses violated his right to due process or a fair trial, we conclude there is no basis for reversal on the ground of misjoinder.  (See People v. Balderas, supra, 41 Cal.3d at p. 175 [even assuming the trial court should have severed charges, reversal after trial is required "only for a 'miscarriage of justice' (See Cal. Const., art. VI., § 13)"]; United States v. Lane (1986) 474 U.S. 438, 446, fn. 8 [106 S.Ct. 725; 88 L.Ed.2d 814]["[i]mproper joinder does not, in itself, violate the Constitution" but "[r]ather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"].)

Hall, 2011 WL 4499245, at *8-9.

Generally, the propriety of consolidating the trial of counts "rests within the sound discretion of the state trial judge." Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991).  To

18

prevail on a claim that a trial court erred in failing to sever counts, a habeas petitioner must "demonstrat[e] that the state court's denial of his severance motion rendered his trial 'fundamentally unfair.'"  See Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997); see also United States v. Lane, 474 U.S. 438, 446 n.8 (1986) ("Improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.").

A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials.  Grisby, 130 F.3d at 370.  Nor is it concerned with procedural right to severance afforded in federal trials.  Id.; see Collins v. Runnels, 603 F.3d 1127, 1131-32 (9th Cir. 2010) (finding that Supreme Court decisions addressing severance under federal rules do not apply to analysis of whether joinder in state courts was constitutional).  Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution.  Grisby, 130 F.3d at 370.  To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair.  Id.  In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict.  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

There is a "'high risk of undue prejudice whenever . . .

19

joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible.'"  United States v. Lewis, 787 F.2d 1318, 1321 (9th Cir. 1986) (omission in original).  This risk is especially great when the prosecutor encourages the jury to consider the two sets of charges in concert, e.g., as reflecting a modus operandi even though the evidence is not cross admissible, and when the evidence of one crime is substantially weaker than the evidence of the other crime.  Bean v. Calderon, 163 F.3d 1073, 1084-85 (9th Cir. 1998).  But joinder generally does not result in prejudice if the evidence of each crime is simple and distinct (even if the evidence is not cross admissible), and the jury is properly instructed so that it may compartmentalize the evidence.  Id. at 1085-86; see, e.g., Davis v. Woodford, 384 F.3d 628, 638-39 (9th Cir. 2004) (denial of motion to sever trial of capital and noncapital charges based on separate incidents not a violation of due process because evidence was cross-admissible, the weight of evidence with respect to each incident was roughly equal, the evidence as to each incident was distinct, and the jury was properly instructed). Similarly, joinder generally does not result in prejudice if the jury did not convict on all counts because it presumably was able to compartmentalize the evidence.  Park v. California, 202 F.3d 1146, 1149-50 (9th Cir. 2000).

The state appellate court's denial of this claim was not contrary to, or an unreasonable application of, clearly established Federal law.  The record supports the findings that the drug charges

20

were factually distinct from the murder charge so there was little

risk that the jury would be confused.  While the prosecutor argued

that the crimes were connected, it was not likely that the jury was

influenced in determining the murder charge because of knowledge of

the drug offenses.  This is supported by the jury verdict which

acquitted Petitioner of first degree murder, and by the jury's

failure to reach a verdict on two drug counts.  See Park, 202 F.3d

at 1149-50 (joinder generally does not result in prejudice if the

jury did not convict on all counts because it presumably was able to

compartmentalize the evidence).  Petitioner has failed to

demonstrate that the state court's denial of his severance motion

resulted in prejudice great enough to render his trial fundamentally

unfair.  Habeas relief is denied on this claim.

### C

Petitioner next argues that the trial court erroneously

permitted introduction of testimony that witness Jacob Lee

identified Petitioner from a photographic lineup.  The state

appellate court denied the claim as follows:

> Before trial Hall filed a motion to exclude any testimony
> regarding Lee's identification of Hall as Marzullo's murderer
> on the ground that any in-court identification would be
> tainted by an unduly suggestive police-arranged six-photo
> lineup shown to Lee on August 20, 2007.  The trial court
> denied the motion after finding that the photo lineup was not
> unduly suggestive even though Hall's image in his photo was
> more prominent than the images of the men in the other five
> photos.  On appeal Hall argues the trial court erred by
> permitting Lee's identification testimony.  He also contends
> the introduction of Lee's identification evidence, which was
> not otherwise reliable, violated his right to a fair trial.
> We conclude Hall's contentions are unavailing.

> "[C]onvictions based on eyewitness identification at trial
> following a pretrial identification by photograph will be set

aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (Simmons v. United States (1968) 390 U.S. 377, 384 [88 S. Ct. 967; 19 L.Ed. 2d 1247].)  "We independently review 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.'" (People v.. Avila (2009) 46 Cal. 4th 680, 698-699.)  After our independent review of the photos in the lineups shown to Lee, we conclude that Hall's photo in the lineup was not so impermissibly suggestive so as to give rise to a very substantial likelihood of irreparable misidentification.

Hall does not attack the appearance of the men in the photo lineup.  Each color photo was generated by a computer and depicts men that appear to be African-Americans with essentially the same skin tone and wearing identical orange shirts.  Five of the men are bald or have hair very close to their scalps (including Hall), and one man has a receding hairline with a short-cropped full head of hair.  The men have varying degrees of facial hair.

We agree with the observations made by both defense counsel at trial and the trial court that Hall's image is more prominent than the other five men, which could well be a function of how close he was to the camera when his photo was taken.  However, a photo lineup is not considered "unconstitutional" merely because one suspect's photo "is much more distinguishable from the others in the lineup."  (People v. Brandon (1995) 32 Cal. App. 4th 1033, 1052.)  Hall's suggestion that his photo appears to have been generated from a source different from the other five photos is not supported by evidence or a visible observation of the photos.  Nor can we conclude that Hall's photo was improperly highlighted by being placed in "the top center position."  "[N]o matter where in the array a defendant's photograph is placed, he can argue that its position is suggestive.  [Citation.]"  (People v. Johnson (1992) 3 Cal. 4th 1183, 1217, citing People v. DeAngelis (1979) 97 Cal. App. 3d 837, 841 [court upheld lineup despite claim of strategic placement of defendant's photo toward center of display].)

We also see no merit to Hall's contention that the photo lineup was unduly suggestive based on the distinctiveness and placement of his photo, coupled with the following facts: "[T]he homicide occurred two and a half months earlier and the officers had shown Lee five lineups within two weeks, including several on June 19.  There had been no other lineups until August 20, also indicating that something had occurred to invite the officer's interest in one of the people in the lineup."  "Anyone asked to view a lineup would naturally assume the police had a suspect."  (People v. Carpenter (1997)

15 Cal. 4th 312, 368.)  There is no evidence that Lee was told or knew that Marzullo's killer had been arrested and his photo would appear in the lineup.  When Lee was shown the lineup, he was specifically informed that the person who committed the crime might not be present and he was not required to identify anyone.  As the trial court commented, the fact that Lee had viewed similar lineups in which a person's image appeared more prominent than other images and failed to make an identification made it less likely that Lee would place any significance on the prominence of Hall's image or the placement of his photo in the lineup.  Hall has failed to demonstrate that Lee was impermissibly pressured "to acquiesce" in any suggestion that he select Hall's photo. FN10  (Manson v. Brathwaite (1977) 432 U.S. 98, 116 [97 S. Ct. 2243; 53 L.Ed. 2d 140] [addressing single photo display].) Because the photo lineup was not unduly suggestive, we need not address Hall's argument that Lee's identification was unreliable under the totality of the circumstances.  "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification."  (People v. Yeoman (2003) 31 Cal.4th 93, 125.)

> FN10. Indeed, as noted in defense counsel's closing argument, despite the purported suggestiveness of the photo lineup, Lee did not "to his credit ... take the bait," because Lee only said Hall "looks like" the killer.

We reject Hall's suggestion that his trial was unfair because the court allowed evidence regarding Lee's identification of Hall's photograph as being the most accurate photograph depicting the person that looked like the man who stabbed Marzullo.  (People v. Alexander (2010) 49 Cal. 4th 846, 903.) Lee's observation and description of the killer was sufficient to allow the jury to evaluate its probative value, and if appropriate, disregard his testimony that Hall looked like the killer.  (People v. Dominick (1986) 182 Cal. App. 3d 1174, 1197.)  "The circumstances of the [photo lineup] identification were disclosed to the [jury], they were the subject of thorough cross-examination, and the jury was able to evaluate the reliability of [Lee's] identification by comparing the [lineup] photographs to the composite drawing [of the suspect] and to [Hall's] current appearance at trial." (People v.. Alexander, supra, 49 Cal. 4th at p. 903.)  Hall's cross-examination of the police witnesses and closing arguments "'expose[d] to the jury the ... potential for error'" in the police-arranged lineup procedures.  (People v. Bethea (1971) 18 Cal. App. 3d 930, 938.)  The trial court's instructions "'sufficiently focused the jury's attention on the People's burden of proof on the issue of identity,'" and "g[a]ve the jury a focal point for considering

23

1     cross-examination and arguments as to the credibility and
2     reliability of" Lee's identification.  (People v. Hurley
     (1979) 95 Cal. App. 3d 895, 901.)  "[E]vidence with some
3     element of untrustworthiness is customary grist for the jury
     mill.  Juries are not so susceptible that they cannot measure
4     intelligently the weight of identification testimony that has
     some questionable feature."  (Manson v. Brathwaite, supra, 432
5     U.S. at p. 116; see People v. Alexander, supra, 49 Cal. 4th at
     p. 903; People v. Arias (1996) 13 Cal. 4th 92, 170.)

6 Hall, 2011 WL 4499245, at *9-10.

7     Due process may require suppression of eyewitness

8 identification evidence where the identification procedure used was

9 suggestive and unnecessary.  Perry v. New Hampshire, 132 S. Ct. 716,

10 718 (2012); Manson v. Brathwaite, 432 U.S. 98, 107-09 (1977); Neil

11 v. Biggers, 409 U.S. 188, 196-98 (1972).  However, improper state

12 conduct in arranging unnecessarily suggestive pretrial

13 identification procedures alone does not require exclusion of

14 in-court identification testimony; the reliability of the eyewitness

15 testimony is the "linchpin" in determining its admissibility.

16 Manson, 432 U.S. at 100-14; see United States v. Drake, 543 F.3d

17 1080, 1089 (9th Cir. 2008).  Identification testimony is

18 inadmissible as a violation of due process only if (1) a pretrial

19 encounter is so impermissibly suggestive as to give rise to a very

20 substantial likelihood of irreparable misidentification, and (2) the

21 identification is not sufficiently reliable to outweigh the

22 corrupting effects of the suggestive procedure.  Van Pilon v. Reed,

23 799 F.2d 1332, 1338 (9th Cir. 1986).

24     After reviewing the photographic lineup viewed by the

25 witness, the trial court and the California Court of Appeal found

26 that the lineup was not unduly suggestive.  The courts also noted

27

28         24

that the witness had viewed several other lineups with similar discrepancies in the pictures, but he did not make an identification in those lineups.  Petitioner has failed to show that the California Court of Appeal's decision was an unreasonable application of Supreme Court authority.

While Petitioner's image in the lineup was more prominent than the images in the other photographs, the witness had viewed other lineups with one image more prominent than others without identifying any suspect.  Moreover, the witness had a good opportunity to view the suspect during the incident and had seen Petitioner on several other occasions.  Reporter's Transcript ("RT") at 1363-68, 1375-78.  He also provided a description to the police on the night of the murder.  RT at 1375.  Because Petitioner cannot show an unreasonable application of Supreme Court authority in the state court's denial of this claim, he is not entitled to habeas relief.

D

Petitioner argues that the trial court erroneously allowed the prosecution to impeach him with statements he made to jail personnel.  The state appellate court denied the claim as follows:

> Before Hall testified, the prosecutor requested permission to
> introduce into evidence statements made by Hall to Sheriff's
> Deputy George Coviello while Hall was in jail.  The prosecutor
> informed the court that if allowed, Coviello would testify
> that (a) on November 23, 2008, Hall stated: "I will be out in
> January and will see you all out on the streets.  I'm going to
> beat my second murder.  I don't care if you are out with your
> wife or your kids, you will regret seeing me.  Then we will
> see how tough you all are"; and (b) on November 25, 2008, as
> Hall passed and glared at Coviello, Hall said: "It's just you
> and me now.  I'll see you soon.  Better be ready."  Then Hall
> apparently smiled.  As to Hall's statement, " 'I'm going to

25

beat my second murder,'" the prosecutor sought its
introduction as "an admission," to be used "for
cross-examination as well as substantively proving it through
the [d]eputy." The trial court did not immediately rule on
the prosecution's request, and Hall did not request a ruling
before he chose to testify.

During direct examination, defense counsel asked Hall why he
did not complain when he was arrested for assaulting Fore. He
responded: "I've learned that any incidence [sic] with the
police officers, you don't say nothing to any of them at any
time. They have these accidents, you know, and these
accidents happen in custody. It's not isolated to San
Francisco. Houston, New York, Atlanta." The prosecutor
interrupted at this point, stating: "You said 'Accidents'?" to
which Hall replied: "Yeah, they have accidents. They just had
an accident in the BART station in Fruitvale, an accident, and
I don't want to have another accident. So, I learned to be
quiet because they have these accidents that happen."

After Hall's direct examination, the prosecutor renewed his
request to admit Hall's statements made to Coviello. The
trial court granted the request, after noting that the
prosecution had not opened the door to Hall's testimony
regarding his reasons for remaining "stoic" during his arrest
but that Hall's expanded testimony referring to a recent BART
shooting opened the door to the proposed evidence. In
response to Hall's specific challenge to the use of his
statement about "beating his second murder" as an admission,
the court ruled it would allow Hall's entire statement, citing
to portions of <u>People v. Sapp</u> (2003) 31 Cal. 4th 240, 275,
<u>People v. Hill</u> (1998) 17 Cal. 4th 800, 846, and <u>People v.</u>
<u>Cummings</u> (1993) 4 Cal. 4th 1233, 1290, in which our Supreme
Court upheld the admission of a defendant's statement or
admission relating to the charged offenses in those cases.

During cross-examination, the prosecutor questioned Hall about
his encounters with Coviello while Hall was incarcerated in
jail awaiting trial. Hall specifically denied making the
statements as set forth in the prosecutor's offer of proof.
During the first encounter, Hall recalled that he had gotten
angry when Coviello refused to allow him to finish a telephone
call for which Hall had paid five dollars. Hall responded by
disrespecting the deputy and calling him a bitch. When
Coviello said Hall should not come to jail if he did not like
the accommodations, Hall responded, "You shouldn't arrest me
on false, bogus charges. You shouldn't file murder charges on
me." Hall also said he was going to get acquitted and be out
in January just like he got acquitted of attempted murder in
the Fore case. Two days later Hall had another encounter with
Coviello. Hall recalled saying to the deputy something like,
"Okay, Coviello, I'm waiting on you any time." Hall said it

26

in a "friendly way," because the deputy said he was going to run into Hall's cell and "do all these heroic acts."

On rebuttal, Coviello testified concerning his two encounters with Hall, including the statements made by Hall as set forth in the prosecutor's offer of proof, and documented in incident reports.  On the first occasion, Hall was "very belligerent, very aggressive," and the deputy understood the statements as a threat that if Hall saw the deputy again, the deputy would be his next victim and he would be acquitted of that crime also.  On the second occasion, Hall glared "menacingly" when he spoke to the deputy.  Coviello was concerned about the statements made by Hall during the second encounter because of Hall's earlier statements.

The parties stipulated that if Police Lieutenant Larry Dorsey was called as a witness, he would testify as follows: He was present during the second encounter between Hall and Coviello. After some verbal exchange between Dorsey and Hall, Hall turned to Coviello and said, "How are you doing, Coviello?" Coviello replied, "I am fine.  Thank you."  Hall replied, "Yeah.  Soon just me and you.  And it ain't gonna be fine." Hall was staring intently at Coviello.  Dorsey ordered Coviello to write an incident report documenting Hall's statements during this second encounter because of Hall's previous statements made to Coviello.

On appeal Hall argues the trial court committed prejudicial error by allowing the prosecutor to present evidence regarding his statements made to Coviello.  We need not address Hall's arguments regarding the admissibility of the evidence.  Even if the trial court should not have allowed the jury to consider the evidence, we are not persuaded that the purported error requires reversal.

"We do not reverse a judgment for erroneous admission of evidence unless 'the admitted evidence should have been excluded on the ground stated and ... the error or errors complained of resulted in a miscarriage of justice.' [Citations.]"  (<u>People v. Earp</u> (1999) 20 Cal. 4th 826, 878; see <u>People v. Watson</u>, <u>supra</u>, 46 Cal. 2d at p. 836 [under our state constitutional standard an error is harmless unless it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)  Contrary to Hall's contention, the evidence of his statements made to Coviello did not result in "the introduction of a large amount of inflammatory character evidence and the consumption of a huge amount of time."  To the extent Hall argues the prosecutor misused the evidence as proof of Hall's bad character and guilt, we note there were no objections to the prosecutor's references to the evidence in

27

his closing arguments.  If the prosecutor's closing arguments were "susceptible of the interpretation [Hall] now asserts, [defense] counsel likely would have objected at trial on this basis.  Such an omission suggests that '"the potential for [prejudice] argued now was not apparent to one on the spot."' [Citation.]"  (<u>People v. Young</u> (2005) 34 Cal. 4th 1149, 1203.) The jurors were properly instructed as to how to evaluate Hall's statements made to Coviello.  We therefore conclude, that any purported error in the admission of evidence of his statements did not result in a miscarriage of justice.  It is not reasonably probable that a result more favorable to Hall would have been reached in the absence of the alleged error. (<u>People v. Watson</u>, <u>supra</u>, 46 Cal. 2d at p. 836.)  Contrary to Hall's contentions, any purported error did not so infect "the fairness of this trial" as to result "in a conviction that is unreliable and in violation of due process."

<u>Hall</u>, 2011 WL 4499245, at *11-12 (footnote omitted).

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  <u>See</u> <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  <u>Holley</u>, 568 F.3d at 1101.

Petitioner has failed to demonstrate that the admission of this evidence resulted in the denial of a fair trial.  During his direct and cross-examination, Petitioner testified to his version of events and what statements he made and denied that he had made the statements attributed to him.  The jury was properly instructed on how to view the evidence:

Using language in CALCRIM No. 358, the trial court advised the jury, in pertinent part: "You have heard evidence that the defendant made oral ... statements before or during the trial.  You must decide whether or not the defendant made any of these statements, in whole

28

> or in part.  If you decide that the defendant made such
> ... statements, consider the statements, along with all
> the other evidence, in reaching your verdict.  It is up
> to you to decide how much importance to give to such
> statements.  [¶]  You must consider with caution evidence
> of a defendant's oral statement unless it was written or
> otherwise recorded."

<u>Hall</u>, 2011 WL 4499245, at *12.

Petitioner has failed to meet the heavy burden in showing a due process violation based on the admission of these few statements.  He is not entitled to habeas relief on this claim.

E

Finally, Petitioner contends that the cumulative effect of the errors described above deprived him of his right to a fair trial.  The state appellate court denied the claim stating, "[w]e reject Hall's contention that cumulative error requires reversal. Either considered singly or in the aggregate, any assumed errors were not prejudicial and did not deprive Hall of a fair trial or reliable verdicts."  <u>Hall</u>, 2011 WL 4499245, at *13.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  <u>See</u> <u>Alcala v. Woodford</u>, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak.  <u>See</u>, <u>e.g.</u>, <u>Thomas v. Hubbard</u>, 273 F.3d 1164, 1179-80 (9th Cir. 2002), <u>overruled on other grounds by</u> <u>Payton</u>

v. Woodford, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error when there has not been more than one error.  United States v. Solorio, 669 F.3d 943, 956 (9th Cir. 2012).

This Court has not found any constitutional errors let alone multiple errors that cumulatively would allow for reversal. See Hayes, 632 F.3d at 524.  Moreover, there was sufficient evidence implicating Petitioner in the drug sales and the murder.  This claim is denied.

V

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Further, a Certificate of Appealability is DENIED.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22

1   of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the

2   Rules Governing Section 2254 Cases.

3          The Clerk is directed to enter Judgment in favor of

4   Respondent and against Petitioner, terminate any pending motions as

5   moot and close the file.

6          IT IS SO ORDERED.

7

8   DATED     05/04/2015

    THELTON E. HENDERSON
9   United States District Judge

10

11  G:\PRO-SE\TEH\HC.13\Hall1426.hc.wpd

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          31